**BLACK MUSICIANS OF PITTSBURGH**
and George Childress, Rubye Youge, De-Ruyter Kemp, Thomas Miller, Charles Austin and George Spaulding, Individually, and on behalf of all other persons similarly situated, Plaintiffs,

and

Equal Employment Opportunity Commission, Intervenor-Plaintiff,

v.

**LOCAL 60-471, AMERICAN FEDERATION OF MUSICIANS, AFL-CIO,** and **American Federation of Musicians, AFL-CIO,** Defendants.

Civ. A. No. 71-1008.

United States District Court,
D. Pennsylvania.

Dec. 22, 1977.

Stanton D. Levenson, Pittsburgh, Pa., for Black Musicians, et al.

James S. Bukes, Equal Employment Opportunity Commission, Pittsburgh, Pa., Rosemarie Rhodes, Equal Employment Opportunity Commission, Philadelphia, Pa., for Equal Employment Opportunity Comn.

Harold Gondelman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for Local 60–471.

Richard D. Gilardi, Gilardi & Cooper, Pittsburgh, Pa., for AFM, AFL–CIO.

Ronald Rosenberg, Van Arkel, Kaiser, Gressman, Rosenberg & Driesen, Washington, D. C., for AFL–CIO.

## MEMORANDUM

McCUNE, District Judge.

Defendants, Local 60–471 of the American Federation of Musicians, AFL–CIO (Local 60–471) and the American Federation of Musicians, AFL–CIO (AFM) have moved for the assessment of attorney's fees against plaintiffs, the Black Musicians of Pittsburgh (Black Musicians), additional named individual plaintiffs and intervenor-plaintiff, the Equal Employment Opportunity Commission (EEOC), pursuant to Title VII, Section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). Local 60–471 and the AFM have been successful in their defense against plaintiffs' claims in this court, on appeal to the Third Circuit Court of Appeals, and finally, in the Supreme Court, by denial of the Black Musicians' Petition for Certiorari. They now seek attorney's fees alleging that plaintiffs' assertion of their claims was with "vexatiousness, bad faith, abusive conduct, or an attempt to harass or embarrass." We find that these extraordinary circumstances are present here on the part of the EEOC which sought to intervene and was permitted to intervene as a plaintiff. We do not find that the plaintiffs started out in bad faith although they were not well advised. But the EEOC, instead of advising plaintiffs that their evidence was weak or lacking, appeared to vex the defendants and continue an aggressive pursuit of the claims of the plaintiffs even after the evidence of discrimination was found to be deficient. The duty of the EEOC, in our view, was to guide the plaintiffs after the intervention was permitted and guidance should have been in the direction of moderation.

## I

The rule controlling this motion is clear. In *United States Steel Corp. v. United States*, 519 F.2d 359 (3d Cir. 1975), the Third Circuit held that for a successful defendant to recover attorney's fees under § 706(k), he must show "vexatiousness, bad faith, abusive conduct, or an attempt to harass or embarrass" on the part of the unsuccessful plaintiff. It should be noted that this standard is much higher than that governing motions for attorney's fees by successful plaintiffs under the same section. The more stringent standard takes into account the chilling effect that awards of attorney's fees to defendants can have upon Title VII litigation. Keeping in mind this policy of the Circuit regarding fees, we conclude that only cases which clearly should not have been brought may result in an award of attorney's fees to a successful defendant under the *United States Steel* standard.

Our conclusion is buttressed by subsequent interpretations of *United States Steel*. In *Kutska v. California State Col-*

*lege Department of Education,* 549 F.2d 795 (3d Cir., filed July 15, 1977), an award of attorney's fees was affirmed by the Circuit in favor of a successful state agency defendant. No evidence of discrimination was introduced at the trial in *Kutska,* even though a necessary part of the plaintiff's claim. The discharge complained of was made solely as the result of the plaintiff's failure to acquire adequate qualifications for the position he held. Because the plaintiff was aware of the inadequacy of his claim, fees were awarded against him, even though he had, from the commencement of his action, proceeded *pro se.* In *Copeland v. Martinez,* 435 F.Supp. 1178 (D.D.C.1977), attorney's fees were awarded under the *United States Steel* standard because the Title VII litigation upon which the motion arose was without merit and was brought to enhance plaintiff's employment circumstances. The District Judge found that none of the contentions raised by the plaintiff in *Copeland* were supported by credible evidence, and that the plaintiff had in the past obtained advancement through filing sex discrimination grievances. As a result, attorney's fees were awarded.

Based on these cases, the *United States Steel* standard can be seen to require an award of attorney's fees when the action obviously should not have been brought, and bringing it suggests an abuse of the judicial process. All plaintiffs and plaintiff-intervenor agree that this standard should be applied to this action.

## II

Application of the *United States Steel* standard to this action requires reference to our earlier decision on the merits. Because that decision was not published, making as it did no contribution to the development of Title VII precedent, review of our earlier findings is necessary at this juncture, as follows:

Local 60–741 is a merged local, being the progeny of the earlier segregated Locals 60 (Black) and 471 (White). The merger of these locals came about as an attempt to comply with the Civil Rights Act of 1964.

In 1965, merger was facilitated by an agreement which, among other matters, designated six positions on the Executive Board of the resulting Local as positions to be filled from the membership of earlier Local 471 and three as positions to be filled from the membership of earlier Local 60. This agreement remained effective until 1971, after which the entire Executive Board was to be elected at large.

After the merger, the function of the Local remained the same as the function of the Locals was before the merger. The main function of the Local was to fix wage rates. Members of the Local were loosely governed, due to the type of work they did. Most hiring was done by individual orchestra leaders. The Local operated no hiring hall, and, in fact, contended that it almost never received inquiries leading to employment. Plaintiffs, however, contended that calls were received and referrals were not made to blacks due to the absence of blacks on the Executive Board.

There is no question that discrimination was practiced prior to the merger. Evidence of subsequent discrimination was lacking, however, as demonstrated by extensive testimony.

Statistical evidence was developed by plaintiff-intervenor's expert statistician. That evidence was, if anything, supportive of the defendants. The statistics show a higher income subsequent to the merger on the part of black members than on the part of white members.

Plaintiffs admitted at trial that the President of the Local (Osgood) had been doing the best he could to integrate membership. Various events were sponsored by the President of the Local to foster friendship among the members of the merged Local. Plaintiffs admitted, however, a lack of interest on their part in trying to make the merger work. At times, blacks had refused to participate in elections meetings and social events. The cause of their refusal might have been frustration; regardless, it was clear that future progress toward full integration of the two prior locals rested on the renewal of interest in the merged Local.

Not only was it clear that discrimination was not practiced by the defendants after the merger, but plaintiff's evidence also indicated that this fact was obscured by plaintiffs in this litigation for purposes of this litigation. In 1974, a prominent black member ran for a position on the Executive Board at the request of the President of the Local. Plaintiffs requested he withdraw because his success would destroy their argument in this court. Although too late to withdraw, the candidate eased up on his campaign. Despite this fact, he lost by only fifteen votes. The candidate, by his own testimony, felt that he could have won easily. After meeting with the plaintiffs, however, he was caused to feel that perhaps he may have been used by the union to create the impression the merger was working.

### III

Our findings on the merits clearly indicated the dearth of evidence of discrimination, during and after the merger, adduced at trial. The weakness of plaintiffs' case (and the impropriety of its being brought at all) is more pronounced, however, when these findings are viewed in light of the extensive pretrial procedure engaged in and the theories that were finally presented by plaintiffs. We focus here on the role of the EEOC, for as we conclude in Part IV, below, an award of attorney's fees against plaintiffs is not appropriate.

The involvement of the EEOC in this action has been irregular from its inception. The EEOC entered the case at two junctures. The action, as originally filed, had not proceeded through EEOC administrative procedures; no charge had been filed with the EEOC by any plaintiffs. A charge alleging membership and employment discrimination was eventually filed (subsequent to the complaint) by the Black Musicians, and the case was continued for EEOC consideration on March 6, 1971. Conciliation failed, however, (notice of failure was

given on April 10, 1973), and we ordered the parties to proceed. The EEOC did not, however, join the action at that time or in the period immediately subsequent to its administrative determination.[1] For a substantial period of time the plaintiffs took no interest in the case. At least their attorneys took none. Between 1971 and 1974, however, the EEOC was not a party, and thus this delay cannot be attributed to it.[2]

On May 8, 1974, the EEOC filed a motion for leave to intervene. Even though this motion to intervene was made only two months prior to the date set for trial, we granted the EEOC motion in the belief that they could, in fact, "aid in the expeditious determination of the issues." Our grant was made, however, subject to the following limitations:

"(a) The EEOC shall adopt the pleadings already filed. It shall not add issues not already contained within the pleadings of the parties.

"(b) The EEOC shall not begin its own discovery. It is not forbidden to assist plaintiffs in their discovery but the EEOC shall not commence discovery of its own.

"(c) The EEOC shall not be the cause of any delay in bringing the proceeding on for trial."

*Black Musicians v. Local 60–471*, C.A. 71–1008 (Order of May 8, 1974) at p. 2.

Substantial delay followed intervention by the EEOC. These delays can be attributed to the preparation of the EEOC case in chief, particularly the expert's statistical report.

Three delays were requested and granted. At each instance, they were caused by difficulties encountered in acquisition and analysis of data by the EEOC's expert. Finally, during the second pretrial conference on September 20, 1974, counsel for the EEOC admitted that the evidence of discrimination was insubstantial.

---

1. More detailed consideration of problems encountered prior to EEOC intervention can be found at 375 F.Supp. 902.

2. The posture of the case at the time of EEOC intervention should have in itself caused the EEOC to question the validity of the claims asserted.

"Mr. Gibson:

We have preliminary, I don't even want to call them reports, but we have summaries of his (the expert's) progress so far, and as I pointed out that basically are inconclusive. In some aspects they have been surprising to us and surprising in a way that we thought quite frankly that the data was going to go the other way. "I can give you an example, we have indications now that if you look at it as a class comparing all blacks to all whites rather than the lawsuit just whoever is going to opt into the lawsuit if you compare the overall class of black musicians in the area with white musicians it looks like black musicians during the three years of the detailed tapes grossed more money. That quite candidly surprised us, we didn't anticipate that.

\* \* \* \* \* \*

"I was sitting here on Wednesday telling your Honor that we are ready to go to trial. Since then we have come up with checks and we have come up with over 300 and when you run the 300 as compared to the 2000 some odd whites, blacks as a class are earning more money than the whites. I don't think that in any way washes out the issue. They probably work much longer hours in clubs that don't pay this high scale. That is what the code may disclose to us buy the whole thing that I have been trying to do with the case all along is to get the bedrock facts. I would like to see how it worked from the tapes, your people may understand the tapes better. It is the pension fund that is close to the Union. If we can drive the thing to the bedrock facts we are done and we shouldn't be engaging in the kind of speculation and suspicion that led to the filing of the lawsuit when with what we have at hand we can drive the thing home."

September 20, 1974, Pretrial Conference, pp. 14, 15–17.

Despite recognition that the data produced was insufficient, the EEOC made no effort to compromise its claim or discontinue the suit. The data produced at trial was no more substantial than that discussed at the September pretrial conference. That data comprised the entirety of the EEOC's evidence at trial.

Three conclusions can be made. First, both plaintiffs and the EEOC knew there was little evidence of discrimination available, and that the difficulties of the merged Local could be attributed as much to the plaintiffs as to the Local. Second, they knew that there was absolutely no evidence of disparate employment opportunities, and even if there were, there was no evidence that the Local had any effect on the hiring done, as it had no hiring hall and received at most, an insubstantial number of job referrals. Finally, the EEOC knew that the statistics offered as their case in chief were not conclusive and, in fact, substantially supported defendants' position. In light of these conclusions, the EEOC's decision to pursue litigation on theories of membership and hiring discrimination was made in bad faith.

IV

Both plaintiffs and the EEOC exhibited evidence of bad faith in bringing this action. The EEOC erred in refusing to dismiss the action or advise plaintiffs to withdraw it when it was obviously without merit and in delaying the action for the development of evidence when it had determined that the evidence already found had gone against the plaintiffs and had shown discrimination to be lacking. Plaintiffs, of course, engaged in bad faith activity when they convinced a promising black candidate to ease up on his campaign for election to the Executive Board. Even though all were engaged in bad faith activity, we hesitate to assess fees against a group of individuals who may have lacked knowledge of what constituted discrimination. They may have been poorly advised. But the EEOC is presumably expert in these matters. It could have noticed the lack of interest and the lack of evidence. It could have discovered the efforts the Union was making to bring the races together but instead of advising against litigation, it put the Union to great expense.

Because we are assessing fees against the EEOC alone, only those charges made while the EEOC pursued the action should be assessed against it. Since appeal was taken by plaintiffs, charges relating to appeal should not be paid by the EEOC. Because it is not certain which charges were made by the attorneys for defendants while the EEOC was involved in the action, a hearing is necessary to sort out the relevant charges and their value.

### V

The EEOC argues that because the AFM did not move for attorney's fees at trial, they should not be awarded fees. Because the Local moved for fees during trial, however, we can see no prejudice in allowing this motion after remand. See *Souza v. Southward,* 564 F.2d 609 (1st Cir., 1977).

An appropriate order follows.